**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| STEVEN B. PATTERSON, | ) | |
| Plaintiff, | ) | CASE NO. 1:14CV1132 |
| | ) | |
| v. | ) | JUDGE JAMES GWIN |
| | ) | |
| | ) | MAGISTRATE JUDGE GREG WHITE |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security | ) | **REPORT & RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |

Plaintiff Steven B. Patterson ("Patterson") challenges the final decision of the Acting Commissioner of Social Security, Carolyn W. Colvin ("Commissioner"), denying his claim for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Title II and Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423, 1381 *et seq.*  This matter is before the Court pursuant to 42 U.S.C. § 405(g) and Local Rule 72.2(b).

For the reasons set forth below, it is recommended that the final decision of the Commissioner be VACATED and the case REMANDED for further proceedings consistent with this Opinion.

## I.  Procedural History

On April 4, 2011, Patterson filed applications for POD, DIB, and SSI alleging a disability onset date of September 25, 2006 and claiming he was disabled due to "severe pain in entire right leg/huge swelling from knee to ankle."  (Tr. 215, 239.)  His applications were denied both initially and upon reconsideration.  (Tr. 166-172, 175-180.)

On October 11, 2012, an Administrative Law Judge ("ALJ") held a hearing during which Patterson, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 34-89.)  On January 25, 2013, the ALJ found Patterson was able to perform a significant number of jobs in the national economy and, therefore, was not disabled.  (Tr. 16-29.)  The ALJ's decision became final when the Appeals Council denied further review.  (Tr. 1-5.)

## II.  Evidence

### Personal and Vocational Evidence

Age thirty-nine (39) at the time of his administrative hearing, Patterson is a "younger" person under social security regulations.  *See* 20 C.F.R. § 404.1563(c) & 416.963 (c).  (Tr. 27.) He has a high school education and associate's degree in web design, and past relevant work as a welding machine operator, porter cleaner, and cashier/assistant manager.  (Tr. 22, 27.)

### Relevant Medical Evidence

Patterson has complained of chronic pain and swelling in his right leg since at least 2006. (Tr. 347, 348, 352.)  Between September 2006 and August 2009, he underwent a series of medical tests in an attempt to ascertain the cause of this condition.  (Tr. 336, 345, 347, 348, 351, 352.)  On September 26, 2006, Patterson underwent a duplex ultrasound of his right lower extremity in response to complaints of right leg pain and calf swelling.  (Tr. 345.)  The ultrasound revealed no findings of deep vein thrombosis.  *Id.*  On June 20, 2008, he underwent a CT scan of his abdomen and pelvis due to "leg swelling, abdominal and pelvic pain."  (Tr. 358.) The exam was inconclusive due to Patterson's refusal of an IV contrast.  *Id.*

On June 29, 2009, x-rays were taken of Patterson's pelvis, right femur, and right tibia and fibula.  (Tr. 347, 351, 352.)  The pelvic x-ray was negative for acute bony pathology or soft tissue mass.  (Tr. 347.)  The right femur x-rays were also negative for acute bony pathology.  (Tr. 348.)  The right tibia and fibula x-rays were negative for bone fracture, but did reveal diffuse edema and soft tissue prominence of the right lower extremity.  (Tr. 352.)  On this same date, Patterson also underwent an ultrasound of his right lower extremity, which was negative for thrombosis or obstruction.  (Tr. 351.)

On August 6, 2009, an electromyogram ("EMG") was conducted to evaluate Patterson's

2

right leg pain. (Tr. 336.) This report found as follows:

> This is a very technically difficult study to perform due to significant obesity and swelling and edema. Therefore, the sural nerve conduction studies are not reliable. There is no suggestion of any motor nerve conduction abnormalities except for right tibial nerve conduction studies which show low amplitude tracings secondary to degenerated abductor hallucis brevis muscle. These findings truly do not suggest peripheral neuropathy, though this cannot be ruled out or isolated given the significant soft tissues and edema. Needle electrode examination does identify some minor L5-S1 radicular changes without any active denervation. Other forms of evaluation may be helpful to isolate lumbar radiculopathies in this gentleman.

(Tr. 336.)

On June 8, 2010, Patterson presented to Sana Abumeri, M.D., with complaints of right leg pain. (Tr. 321.) Her treatment note indicates that, at the time of this visit, Patterson was 5' 9" and weighed 350 pounds. *Id.* X-rays of Patterson's knees showed soft tissue swelling worse on the right, and possible mild degenerative narrowing at the lateral patellofemoral joint. (Tr. 325.) There was no indication of acute osseous abnormality. *Id.* Dr. Abumeri assessed right leg pain and lymphedema. (Tr. 321.)

On December 26, 2010, Patterson went to the emergency room ("ER") after several blisters on his right leg "popped;" oozed clear liquid; and, turned red. (Tr. 366.) He was given intravenous ("IV") antibiotics, and discharged. *Id.* On December 29, 2010, Patterson presented to Stephen B. Cullen, M.D., for follow up treatment. *Id.* Patterson reported chronic leg swelling for the past ten years. *Id.* On examination, Dr. Cullen noted Patterson's leg was "feeling better" and the redness was gone. *Id.* He further observed as follows: "extremities right leg with chronic edematous changes. No erythema now. There are some scabs and clear blistering. Left leg looks ok." *Id.* Dr. Cullen assessed "cellulitis of leg (except foot improving); edema to vascular dr.; * * * , [and,] obesity, morbid work on wt loss." *Id.* He ordered blood work and continued Patterson's medications. (Tr. 366-367.)

Patterson underwent a consultative examination with Sam N. Ghoubrial, M.D., on May 17, 2011. (Tr. 373-381.) Patterson reported "difficulty standing predominantly because of swelling in his right leg, as well as his weight." (Tr. 377.) He stated he had suffered from right leg swelling since 2005, as well as recurrent cellulitis. *Id.* Patterson further indicated he could

3

walk 300 feet at a time with the assistance of a cane before he needed to stop and rest.  *Id*.  Dr. Ghoubrial recorded Patterson's weight as 401 pounds.  (Tr. 379.)  His examination notes indicate Patterson had "mild decreased range of motion of the lumbar spine on flexion and extension secondary to abdominal girth."  (Tr. 380.)  Dr. Ghoubrial further noted Patterson had +2 radial pulses throughout in his upper extremities, but that his pincer movements and fine coordination appeared to be within normal limits.  *Id.*  With regard to Patterson's lower extremities, Dr. Ghoubrial observed +2 pulses throughout; venous stasis dermatitis with +1 to +2 edema in the right lower extremity; mild decreased range of motion of his hips; and, a "stage II open area measuring about 2 x 2 cm on the distal right lower extremity."  (Tr. 381.)  Dr. Ghoubrial noted Patterson was able to get on and off the exam table without difficulty, and able to do heel to toe walking.  *Id.*  He further noted Patterson "walks with the aid of a nondependent cane in his left hand."  *Id.*

Dr. Ghoubrial assessed obesity; right lower extremity swelling and cellulitis; and, back and shoulder pain.  (Tr. 381.)  He concluded as follows:  "[b]ased on my evaluation of this claimant, I feel he would have no difficulty sitting, handling objects, hearing, speaking, seeing or traveling.  I do feel he would be able to lift and carry objects weighing 10 to 20 pounds for short distances for at least four hours in an eight-hour day."  *Id*.

On June 14, 2011, state agency physician Gary Hinzman, M.D., reviewed Patterson's records and completed a Physical Residual Functional Capacity ("RFC") Assessment.  (Tr. 102-103.)  Therein, Dr. Hinzman found Patterson was capable of lifting and/or carrying 20 pounds occasionally and 10 pounds frequently; standing and/or walking for a total of 4 hours; and, sitting for a total of about 6 hours in an eight hour work day.  (Tr. 102.)  He opined Patterson could occasionally climb ladders, ropes, and scaffolds; frequently climb ramps and stairs; and, frequently stoop, kneel, crouch, and crawl.  (Tr. 102-103.)  Dr. Hinzman further concluded Patterson had unlimited push/pull capacity and an unlimited ability to balance.  (Tr. 102.)  Finally, Dr. Hinzman offered that Patterson had no manipulative, visual, communicative, or environmental limitations.  (Tr. 103.)

On July 28, 2011, Patterson presented to the ER with complaints of worsening right

4

lower extremity edema with pain and redness.  (Tr. 437-439.)  The ER doctor noted erythema, small blisters, and abrasions over Patterson's right leg and right foot, but no open wounds or drainage. (Tr. 437-438.)  Patterson was admitted for treatment of right lower extremity cellulitis and given IV antibiotics.  (Tr. 438.)  Later that day, Patterson underwent a venous duplex ultrasound of his right lower extremities, which was negative for deep vein thrombosis.  (Tr. 440.)  The following day, a CT scan of Patterson's right leg revealed marked generalized soft tissue swelling; and, "cellulitis and panniculitis, without discernible abscess."  (Tr. 433.)  Patterson was discharged on July 30, 2011 with a final diagnosis of right leg cellulitis, and secondary diagnoses of chronic right lower extremity lymphedema; arthritis; morbid obesity; and, asthma.  (Tr. 442.)  He was advised to obtain follow up care within two weeks.  *Id.*

On September 21, 2011, Patterson returned to the ER for treatment of an open wound on his right leg with associated "drainage, edema, itching, purulent drainage, swelling, and tenderness." (Tr. 421-422.)  It was noted Patterson had been hospitalized in July 2011 for cellulitis and that he "has had no follow up since that time."  (Tr. 422.)  Examination notes indicated (1) "severe non-pitting edema throughout bilateral lower extremities," right leg worse than the left; (2) 2+ distal pulses bilaterally; (3) right lower extremity with erythema over distal anterior leg; and, (4) an approximately 4 cm diameter circular scabbed lesion with dry skin.  *Id.* Patterson was assessed with "severe lymphedema bilateral legs, right [lower extremity] with skin changes consistent with chronic venous stasis; no evidence of acute infection." (Tr. 422-423.) Treatment notes indicate the ER physician attempted to arrange for a home health nurse, but was unsuccessful because "patient has no insurance."  (Tr. 423.)  Patterson was discharged with a prescription for compression stockings, and reminded of the importance of obtaining follow up care.  *Id.*

Patterson returned to the ER again on October 17, 2011 for treatment of worsening of his right lower extremity pain and ulcer.  (Tr. 401.)  Patterson reported that "this all started at the end of July" when he was admitted for treatment of cellulitis.  *Id.*  He stated "the ulcer at that time scabbed over and then a few days later the scab fell off," resulting in drainage.  *Id.* Patterson claimed he had not been followed up by a physician due to lack of insurance.  *Id.*

5

Examination revealed "nonpitting edema consistent with venous stasis and right area of stage 1 ulcer with surrounding area of erythema and warmth," as well as drainage.  (Tr. 402.)  He was assessed with stage 1 right lower extremity ulcer and venous stasis ulcer infection with cellulitis, and admitted for treatment with IV antibiotics.  (Tr. 400, 402.)  A right lower extremity venous duplex exam was conducted on October 18, 2011, which was again negative for deep vein thrombosis.  (Tr. 404.)  Patterson was discharged on October 20, 2011 and instructed to follow up with podiatry and infectious disease specialists.  (Tr. 398.)

On October 21, 2011, Patterson presented to podiatrist Daniel Duffy, DPM.  (Tr. 390-391.)  Dr. Duffy noted a partial thickness venous ulcer on Patterson's right lower leg measuring 0.5 cm in length x 0.5 cm in width.  (Tr. 391.)  He assessed venous insufficiency– peripheral, unspecified; ulcer of other part of lower limb; ulcer of ankle; other lymphedema; and, other cellulitis and abscess- leg, ankle, hip, knee, thigh (except foot).  *Id.*  Dr. Duffy prescribed a zinc Unna boot and ace wrap, and advised Patterson to elevate his leg above the level of his heart when sitting.  *Id.*

Patterson returned to Dr. Duffy on October 28, 2011.  (Tr. 392.)  At that time, Patterson's wound was improving, measuring 0.3 cm in length x 0.5 cm in width.  *Id.*  Dr. Duffy performed a non-excisional selective debridement, which Patterson tolerated well.  *Id.*  On November 11, 2011, Patterson presented to Constantina Demou, DPM for follow up of his right leg ulceration.  (Tr. 396.)  Dr. Demou concluded the wound "is healed," noting it measured 0 cm in length x 0 cm in width.  *Id.*

On December 8, 2011, Patterson presented to the Lorain County Free Clinic for treatment of his right leg lymphedema.  (Tr. 417-419.)  Treatment notes from this visit do not indicate Patterson had an open wound, but do record 4+ pitting edema on his right leg.  (Tr. 417.)

On January 30, 2012, state agency physician Leon D. Hughes, M.D., reviewed Patterson's records and completed a Physical RFC Assessment.  (Tr. 134-137.)  Like Dr. Hinzman, Dr. Hughes found Patterson was capable of lifting and/or carrying 20 pounds occasionally and 10 pounds frequently; standing and/or walking for a total of 4 hours; and, sitting for a total of about 6 hours in an eight hour work day.  (Tr. 135.)  He opined Patterson

6

could never climb ladders, ropes, and scaffolds; frequently climb ramps and stairs; frequently stoop, kneel, and crouch; but never crawl. (Tr. 135.) Dr. Hughes further concluded Patterson had unlimited push/pull capacity and an unlimited ability to balance. (Tr. 135.) Dr. Hughes offered that Patterson had no manipulative or communicative limitations, but that he had visual limitations that precluded him from activities that required the reading of small print and viewing objects at a distance. (Tr. 136.) Finally, Dr. Hughes found Patterson should avoid all exposure to hazardous machinery and unprotected heights. (Tr. 136-137.)

On March 19, 2012, Patterson presented to the ER for treatment of right leg pain, redness, and swelling. (Tr. 476-479.) He stated "red swelling" started two days previously and indicated he was in a great deal of pain, rating it an 8 on a scale of 10. (Tr. 476.) Treatment notes indicate Patterson ambulated with a cane. *Id.* The ER physician observed that both of Patterson's lower extremities were swollen, with a "large circular red area with scabbed area" on his right leg. *Id.* Patterson underwent x-rays of his right tibia-fibula, which revealed diffuse soft tissue swelling and edema as well as a "small ulcer with lucency . . . in the anterior aspect overlying the junction of the mid and distal thirds of the right leg." (Tr. 487.) He was diagnosed with cellulitis/skin infection and lymphedema; and treated with oral and IV antibiotics. (Tr. 478-479.) Patterson was discharged the same day in stable condition and advised to follow up with his primary care physician the next day. (Tr. 479.)

Patterson returned to Dr. Duffy on March 30, 2012 for treatment of an ulcer on his right leg. (Tr. 469-471.) In addition to the ulcer, Patterson complained of shortness of breath; back ache; muscle pain; muscle weakness; headaches; depression; and lower extremity (leg) pain and swelling. (Tr. 469.) Dr. Duffy observed a full thickness venous ulcer on the right medial lower leg that measured 0.3 cm in length x 0.5 cm in width, with a small amount of drainage. (Tr. 470.) He performed a selective debridement, which Patterson tolerated well. *Id.* Dr. Duffy advised Patterson to keep his leg elevated when sitting and return in one week for follow up. (Tr. 470-471.)

Patterson returned to Dr. Duffy on April 6, 2012. (Tr. 467-468.) During this visit, Dr. Duffy concluded Patterson's previous ulcer was improving, now measuring 0.3 cm in length x

7

0.4 cm in width.  (Tr. 467.)  However, Dr. Duffy also recorded another ulcer, which he described as a full thickness venous ulcer located on the right pre-tibial measuring 1.5 cm in length x 1.0 cm in width.  *Id*.  Dr. Duffy cleaned Patterson's wounds and advised him to continue compression therapy and return in two weeks.  (Tr. 467-468.)

Patterson thereafter began treatment with podiatrist Thuan V. Pham, DPM, in September 2012.  (Tr. 511-512.)  Dr. Pham noted a 5 cm ulceration on the anterior shin of Patterson's right lower leg, along with "moderate serious drainage."  (Tr. 511.)  He diagnosed lymphedema bilateral lower legs; venous stasis ulcer, right leg; and, Type 2 diabetes with peripheral neuropathy.  *Id.*  Dr. Pham advised Patterson to continue use of the Unna boot.  *Id*.  Patterson returned to Dr. Pham a week later, who noted "extensive lymphedema . . . on bilateral lower legs."  (Tr. 509-510.)  Dr. Pham concluded Patterson was responding well to treatment, observing his ulcer had shrunk in size to 3.5 to 4 cm in diameter with "no ascending redness." (Tr. 509.)  Patterson presented to Dr. Pham again on October 4, 2012, with "ulceration over the anterior shin of the right lower leg measur[ing] 4 x 5 cm."  (Tr. 507.)  In follow up visits on October 8, 2012 and October 15, 2012, Patterson's ulcer was unchanged.[1]  (Tr. 503, 505.)

Dr. Pham completed a Physical Residual Functional Capacity questionnaire on October 16, 2012.  (Tr. 501-502.)  Therein, Dr. Pham opined that Patterson was capable of standing/walking for less than two hours in an eight hour day; and sitting for about six hours in an eight hour day.  (Tr. 501.)  He concluded Patterson must periodically alternate sitting, standing, or walking to relieve discomfort, and could sit for 60 minutes before changing position. *Id*.  Dr. Pham also found Patterson needed the opportunity to shift positions at will; and, could stand for only five minutes before changing positions.  *Id.*  He offered that Patterson could only

---

[1] After the ALJ rendered his decision, Patterson's attorney submitted additional medical records indicating Patterson continued to see Dr. Pham on a regular basis between October 29, 2012 and February 2013.  (Tr. 513-550.)  As the Appeals Council denied review, this Court's review is limited to the record and evidence before the ALJ. *See Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001); *Cline v. Comm'r of Soc.* Sec., 96 F.3d 146, 148 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993); *Walker v. Barnhart*, 258 F.Supp.2d 693, 697 (E.D. Mich 2003).  Thus, the Court will not consider this additional medical evidence.

8

occasionally reach, handle, finger and feel, and could push/pull "less than occasionally." (Tr. 502.) Finally, Dr. Pham found Patterson's impairments or treatment would cause him to be absent from work more than three times per month. *Id.* When asked to identify the medical findings supporting his opinions, Dr. Pham stated "chronic lymphedema of the right leg. He needs to elevate [his leg] 6 hours of the day."[2] *Id.*

### Hearing Testimony

During the October 11, 2012 hearing, Patterson testified to the following:

- He is married with three children, ages three, six, and nine. He has been separated from his wife for over a year. His wife has custody of the children. He sees his children once a month and watches television with them. He lives with his 72 year old mother in a house. His mother has diabetes and asthma. (Tr. 40-41, 46.)

- His last "real full-time job" was at an adult bookstore. He worked there from 2003 to 2005, first as a porter and bouncer. He eventually became assistant manager. In that position, he lifted no more than 10 pounds and sat most of the day. (Tr. 52-53.) In 2007, he had a temporary, full-time job for three months as a robot welder. That job required him to lift five to ten pounds and be on his feet for six hours per day. He has not worked since 2007. (Tr. 48-51, 69.)

- He attended classes at Ohio Business College and earned an associate degree in web design in the summer of 2010. (Tr. 47,70.) He never got a job in this field, however, and believes his degree is "useless." (Tr. 70.)

- He suffers pain, swelling, and numbness in his right leg. This problem became "more intense" in 2010. (Tr. 50-51.) He has ulcers on this leg that "won't heal up very well" because of the swelling. (Tr. 55-56.) The swelling never decreases. (Tr. 59-60.) It causes pain in his ankle and both hips, which he described as a "constant dull throbbing pain on the inside." (Tr. 60-61.) He was admitted to the hospital in July 2011 and October 2011 because of the pain and the ulcers. (Tr. 59.) From December 2010 until the time of the hearing, there has never been a time when he did not have an ulcer on his leg. (Tr. 58-60.)

- In October 2011, his doctors prescribed an Unna boot to help promote healing of his ulcers. The Unna boot compresses his leg and has to be changed every week. (Tr. 55-56, 59-60.) He takes ibuprofen for the pain, and is not taking any other medications. (Tr. 55, 61.) He elevates his legs "all day long" (and sometimes at night) to relieve the swelling. (Tr. 60.) He also lies down two to three times per week, sometimes for as long as three to four hours. (Tr. 61.)

- He cannot stand on his right foot for more than five minutes, and cannot lift more than twenty pounds. (Tr. 49, 50-51.) When he sits for too long, he gets a "dull

---

[2] The questionnaire also asked Dr. Pham to assess Patterson's maximum abilities to lift/carry on both an occasional and frequent basis. (Tr. 501.) Dr. Pham wrote "n/a." *Id.* It is unclear to the Court what Dr. Pham intended to convey by this response.

throbbing ache." (Tr. 62.)  He is unable to walk around the block, and can only walk for about 300 feet.  He uses a cane.  He can walk without the cane but "it's a chore."  (Tr. 62.)

- He weighs 405 pounds.  He has weighed at least 300 pounds for the last ten to twenty years.  He does not exercise much because it hurts.  (Tr. 63-64.)

- When he is in pain, he "just stay[s] in [his] room and say[s] leave me alone."  (Tr. 65.)  The pain sometimes interferes with his ability to focus and concentrate.  (Tr. 64.)

- He was diagnosed with depression, but is not taking any medication for it.  (Tr. 69.)  He does not believe that any mental issues are preventing him from working.  (Tr. 40.)  He did not have any difficulties getting along with the other students while he was attending college classes.  (Tr. 47-48.)  He does not have problems being around crowds.  (Tr. 48.)  He has quit jobs because he got "pissed off."  (Tr. 71-72.)

- He has asthma but the doctor said it was not "bad enough" for him to need medication.  (Tr. 76-77.)

- He is able to dress himself, make his bed, vacuum, and cook his meals.  (Tr. 42, 44, 67-68.)  He can do some cleaning but cannot bend or stand for very long.  (Tr. 42.)  He is not able to clean the bathroom.  (Tr. 67-68.)  He can carry a laundry basket but it is "troublesome."  (Tr. 68.)  He can do his own grocery shopping, but for no more than thirty minutes.  After thirty minutes, his leg "gets heavy like it doesn't want to work."  (Tr. 67-68.)

- He lost his driver's license in 2010.  There is no bus service where he lives, although he would be capable of taking the bus if there was service in his area.  (Tr. 43-44.)

- He has no friends and does not talk to anyone on the phone.  He does not take his children to restaurants or the movies.  (Tr. 46.)  He plays games and conducts research on his computer.  (Tr. 66-67.)

The VE testified Patterson had past relevant work as a welding machine operator (light, unskilled, SVP 2); cleaner (light, unskilled, SVP 2); and, cashier/assistant manager (light, semi-skilled, SVP 3).  (Tr. 73-75.)  The ALJ then posed the following hypothetical:

Assuming somebody the claimant's age, education, and work experience who's able to perform work at a light level lifting up to 20 pounds occasionally, up to 10 pounds frequently.  Standing and walking for about six hours and sitting for up to six hours in an eight hour workday with normal breaks. Frequently climbing ramps and stairs but never climbing ladders, ropes, or scaffolds, frequently balancing.  Let's see, occasionally stooping, kneeling, crouching. Never crawling * * * Avoid concentrated exposure to wetness, humidity, fumes, odors, dust, gases, and poorly ventilated areas.  And also avoid all exposure to hazardous machinery and unprotected heights. And, let's say, limited to frequent use . . . of foot controls with the right lower extremity. * * * And so let's say limited to tasks involv[ing] superficial interactions with co-workers and the public. Okay, let's do that for the first one, okay.

10

(Tr. 76-78.)  The VE testified such an individual could perform Patterson's past relevant work as a cleaner, but not his past work as a welding machine operator or cashier/assistant manager.  (Tr. 78-81.)  The VE further testified such an individual could perform the jobs of wire worker (light, unskilled); electronics worker (light, unskilled); and, bench hand (sedentary, unskilled).  (Tr. 81.)

The ALJ then modified the above hypothetical to change the standing and walking requirement from six to four hours.  (Tr. 82.)  The VE testified this limitation would significantly reduce the number of wire worker and electronics worker positions, but would not effect the number of bench hand jobs.  *Id.*  He further testified there would be other sedentary jobs that such an individual could perform, such as table worker (sedentary, unskilled) and final assembler (sedentary, unskilled).  *Id.*

The ALJ then posed the following hypothetical:

> And then the third hypothetical will be the same as the first, number one, but add a sedentary level lifting up to ten pounds occasionally.  Standing and walking for about two hours and sitting for up to six hours in an eight hour workday with normal breaks.  And then all the remainder of the limitations that I gave.

(Tr. 83.)  The VE testified such an individual could perform the same previously identified sedentary jobs of bench hand, table worker, and final assembler.  *Id.*

The ALJ then asked "if you add to all of the above hypotheticals that also the person would be limited to tasks that are simple and routine and I think precluded from tasks of all high production quotas, strict time requirements . . . does that change any of the answers?" (Tr. 84.) The VE testified the same previously identified sedentary jobs would still be available.  *Id.*

Patterson's attorney then posed the following hypothetical:

> [I]f we were to assume an individual of the same age, education, and past work experience as the claimant who was limited to sedentary work.  However, he can only stand for a total of one hour in an eight hour workday for 10 to 15 minutes at a time.  He would require the use of a cane.  He would also require that his leg be elevated at least at chair level for 80 to 90 percent of the day.  He's limited to simple, routine, repetitive tasks, and no contact with the general public.

(Tr. 84.)  The VE testified as follows:

> VE:    Well, that would certainly have an impact on the– I think some of the jobs that I gave before might remain but I think the numbers would be significantly reduced. And the reason I say that is because the standing,

11

the standing one hour total is probably not a big problem for some of those but I don't know.  The DOT, when they collect their data they, they base it on standing and walking up to two hours a day.

ALJ:  Why don't you give us, give her the jobs that you, even though you say that it's reduced numbers, can you give us—

VE:  I can't —

ALJ:  — for the record?

VE:  — I don't know how much they would be reduced.

ALJ:  Oh, I see.

VE:  And I think it, I think it would be a significant number of reduction when you add to that the elevating of the leg–

ALJ:  Okay.

VE:  – at chair level 80 to 90 percent of the time.

ALJ:   Okay.

VE:  And certainly you can do that.  I mean I've observed sedentary jobs where that's not a problem but I've also observed sedentary jobs where that would be an issue. It would get in the way of, of perhaps material being moved or, you know, a lot of times materials are stored under the workbench where the individual's working and you can't– there's no place to elevate the leg.

ATTY: Would be that an accommodation in your opinion?

VE:  Well, it – no, in some cases it would not.  But I think in some cases it certainly would have to be because–

ATTY: Would it have a significant impact on the number of jobs available?

VE:  I believe it would, I believe it would. The other problem, and I want to make this clear too, is these are jobs that are done– sedentary jobs in production settings are normally done at a bench, a work bench which is higher than the table we're sitting at and you're on a work stool, okay.  So to elevate your leg to waist level could put your whole body maybe a foot higher than where we're sitting right now.

ALJ:  So the bottom line is no jobs?

VE:  Well, the bottom line is a lot of employers would find that unsafe and they wouldn't–

ALJ:  Right.

VE:  – allow it for that–

* * *

12

ALJ:    Okay, so, no.

VE:     Yeah, I think there would be some jobs but I think the numbers would be very insignificant. I can't give you the exact number.

(Tr. 84-86.)

Patterson's attorney then asked "if this individual would be expected to be absent from the workplace at least one day a week due to symptoms from his severe impairments would that be accommodated or would that provide any jobs?" (Tr. 86.) The VE said there would be no jobs for such an individual. (Tr. 87.)

The ALJ then asked "if you added that the person would require a sit/stand option every hour or, you know, maybe ten seconds without being off task would that affect any of the answers at all?" (Tr. 87.) The VE stated that such a limitation would not effect his answers, testifying that "I can give you the same jobs, same numbers." *Id.*

### III. Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[3]

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and, (3) he filed while he was disabled or within twelve months of the date

---

[3] The entire process entails a five-step analysis as follows: First, the claimant must not be engaged in "substantial gainful activity." Second, the claimant must suffer from a "severe impairment." A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities." Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404, Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000). Fourth, if the claimant's impairment does not prevent the performance of past relevant work, the claimant is not disabled. For the fifth and final step, even though the claimant's impairment does prevent performance of past relevant work, if other work exists in the national economy that can be performed, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

13

the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

Patterson was insured on his alleged disability onset date, September 25, 2006, and remained insured through June 30, 2011.  (Tr. 16.)  Therefore, in order to be entitled to POD and DIB, Patterson must establish a continuous twelve month period of disability commencing between those dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen,* 861 F.2d 991, 994 (6ᵗʰ Cir. 1988); *Henry v. Gardner,* 381 F.2d 191, 195 (6ᵗʰ Cir. 1967).

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6ᵗʰ Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

### IV.  Summary of Commissioner's Decision

The ALJ found Patterson established medically determinable, severe impairments, due to cellulitis; venous insufficiency; right leg lymphedema; edema in the bilateral legs; obesity; affective disorder; arthritis and mild degenerative changes in the right knee; and, asthma; however, his impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1.  (Tr. 18-21.)  Patterson was found incapable of performing his past work activities, but was determined to have a Residual Functional Capacity ("RFC") for a limited range of light work.  (Tr. 21-27.)  The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine that Patterson was not disabled.  (Tr. 27-29.)

### V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6ᵗʰ Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6ᵗʰ Cir. 1983).  Substantial evidence has been

14

defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec*., 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs*., 25 F.3d 284, 286 (6th Cir. 1994)).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v.*

15

*Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  Analysis

### RFC Assessment

Patterson argues the RFC assessment is flawed because it is "clearly not based upon all relevant evidence."  (Doc. No. 15 at 13.)  Specifically, Patterson maintains the ALJ failed to consider Dr. Pham's October 16, 2012 opinion that Patterson would need to elevate his leg for 6 hours per day.[4]  In addition, Patterson faults the ALJ for failing to address his need for a cane to ambulate, particularly in light of medical evidence establishing the chronic and severe swelling of his lower extremities.  Because the ALJ failed to address this evidence, Patterson maintains the RFC does not reflect "what he is capable of doing on a sustained daily basis."  *Id*. at 15.

The Commissioner argues the ALJ properly found Patterson was capable of a reduced range of light work.  She emphasizes the opinions of consultative examiner Dr. Ghoubrial and state agency, non-examining physicians Drs. Hinzman and Hughes that Patterson was capable of standing or walking up to four hours per day, and sitting up to six hours per day.  Additionally, the Commissioner cites medical evidence suggesting Patterson's cellulitis and ulcers responded to treatment, and notes the absence of medical evidence suggesting that Patterson's use of a cane was medically required.  Finally, the Commissioner asserts the ALJ thoroughly considered Dr. Pham's opinion and properly determined it deserved "less weight" than the opinions of Drs. Ghoubrial, Hinzman, and Hughes.

The RFC determination sets out an individual's work-related abilities despite their limitations.  *See* 20 C.F.R. § 416.945(a).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R.§ 416.927(d)(2).  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the

---

[4]  As the RFC questionnaire asked Dr. Pham to offer opinions regarding Patterson's maximum abilities "during an 8 hour day," the Court interprets Dr. Pham's opinion that Patterson must elevate his leg for 6 hours to mean that he must elevate his leg for 6 hours during an 8 hour day.  (Tr. 501-502.)

16

Commissioner." *See* 20 C.F.R.§ 416.927(d)(3).  As such, the ALJ bears the responsibility for

assessing a claimant's RFC, based on all of the relevant evidence.  *See* 20 C.F.R. § 416.946(c).

"Judicial review of the Commissioner's final administrative decision does not encompass

re-weighing the evidence." *Carter v. Comm'r of Soc. Sec.*, 2012 WL 1028105 at * 7 (W.D.

Mich. Mar. 26, 2012) (*citing Mullins v. Sec'y of Health & Human Servs.*, 680 F.2d 472 (6th Cir.

1982); *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 411, 414 (6th Cir. 2011); *Vance v.

Comm'r of Soc. Sec.*, 260 Fed. Appx. 801, 807 (6th Cir. 2008)).

Here, the ALJ considered the hearing testimony and medical evidence regarding

Patterson's lymphedema and recurrent cellulitis, including evidence regarding his course of

treatment with Dr. Pham.  (Tr.  21-25.)  The ALJ then considered the opinion evidence.  He

assigned "significant weight" to the opinions of Drs. Hinzman and Hughes, noting that "[t]he

physical assessment of the two state agency physicians also supports a light residual functional

capacity of the ability to stand and/or walk for four hours, which is consistent with this

decision."  (Tr. 26.)  The decision also accorded "significant weight" to Dr. Ghoubrial's opinion,

finding that "Dr. Ghoubrial's opinions support a light residual functional capacity finding and

standing of four hours, which is supported by other credible evidence in the record."  *Id.*  The

ALJ then considered Dr. Pham's opinion as follows:

> The opinions of the claimant's podiatrist, Thuan Pham, D.P.M., are noted, but are
> given less weight than the other opinions in this case.  Dr. Pham has treated the
> claimant from September 20, 2012 through October 15, 2012.  Dr. Pham's
> medical notes are included in the record at Exhibit 12F.  First of all, it is noted in
> a review of these records that there is little support for Dr. Pham's opinions as
> noted in Exhibit 11F in these treating notes.  It is noted that Dr. Pham did not
> address any lifting limitations.  However, based on the claimant's lymphedema
> and healing ulcer on the claimant's right leg, Dr. Pham apparently opines the
> claimant would be limited in his reaching, handling, fingering, and feeling to
> occasional.  It is unclear in Dr. Pham's report how impairments to the claimant's
> leg would cause these upper extremity limitations.  Furthermore, other evidence
> in the record notes the claimant has significant activities and strength of 5/5,
> which would be inconsistent with Dr. Pham's limitations.  Dr. Pham also notes
> the claimant would miss three days a month of work, which would not appear to
> be supported by any credible evidence in the record.  Dr. Pham did opine that the
> claimant could stand two hours at a time and sit for six hours, which would be
> consistent with sedentary work and which would show the claimant's ability to
> work.  However, the medical record and other opinions indicate the claimant has
> greater functioning ability than at a sedentary level of exertion, as noted in this
> decision.

(Tr. 27.)

The ALJ went on to find that Patterson's medically determinable impairments could reasonably be expected to cause his alleged symptoms, but his statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible in light of his significant activities of daily living; "relatively infrequent trips" to the doctor; non-compliance with treatment and medication; and, the fact that he had not taken medications for many of his symptoms.  (Tr. 26.)  The ALJ formulated the RFC as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant can lift and or carry 20 pounds occasionally and 10 pounds frequently.  The claimant can sit for six hours during an eight-hour workday.  The claimant can stand and/or walk for four hours out of an eight-hour workday.  The claimant can frequently climb ramps and stairs, but never climb ladders, ropes, or scaffolds.  The claimant can frequently balance.  The claimant can occasionally stoop, kneel, and crouch.  The claimant can never crawl.  The claimant should avoid concentrated exposure to wetness, fumes, odors, dusts, gases, and poorly ventilated areas.  The claimant should avoid all exposure to hazardous machinery and unprotected heights.  The claimant is limited to frequent use of foot controls with the right lower extremity.  The claimant is limited to tasks that involve superficial interaction with co-workers and the public.

(Tr. 21.)

Although Patterson phrases his argument in terms of error in formulating the RFC, he spends much of his brief arguing that the ALJ failed to properly consider Dr. Pham's October 16, 2012 opinion.  While unclear, it appears Patterson is asserting that Dr. Pham's opinion is subject to the "treating physician rule," which (as discussed below) requires the ALJ to articulate "good reasons" for rejecting Dr. Pham's opinions.  The Commissioner does not argue that Dr. Pham is not a treating source, at least with respect to his opinion that Patterson would need to elevate his leg for 6 hours per day.[5]  Thus, and in the absence of any argument to the contrary, the Court will

---

[5]  Pursuant to 20 CFR § 404.1513(a), only "acceptable medical sources" are qualified to provide evidence to establish the existence of a medically determinable impairment and render "medical opinions" about the nature and severity of a claimant's impairments, including limitations or restrictions imposed by the impairment.  *See also Lear v. Astrue*, 2009 WL 928371 at * 4 (W.D. Ky. April 3, 2009).  Under this regulation, a licensed podiatrist is considered an "acceptable medical source" for purposes of "establishing impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice

assume for purposes of this Report & Recommendation that Dr. Pham constitutes a treating source with respect to his opinion regarding the need for Patterson to elevate his legs.

Under Social Security regulations, the opinion of a treating physician is entitled to controlling weight if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Meece v. Barnhart*, 2006 WL 2271336 at * 4 (6th Cir. Aug. 8, 2006); 20 C.F.R. § 404.1527(c)(2).  "[A] finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (*quoting* Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*, 2006 WL 2271336 at * 4 (Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions.)  Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[6]

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers*, 486 F.3d at 242 (quoting

---

of podiatry on the foot only, or the foot and ankle." 20 CFR § 404.1513(a)(4).  While the Commissioner references this regulation, she does not argue that Dr. Pham's opinion that Patterson was required to elevate his leg for 6 hours per day falls outside the scope of issues for which he is considered an "acceptable medical source."  Rather, it appears the Commissioner's statement was directed only towards Dr. Pham's opinions that Patterson could only occasionally reach, handle, finger, and feel.  (Doc. No. 17 at 7-8.)

[6]  Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

Soc. Sec. Ruling 96-2p, 1996 SSR LEXIS 9 at * 5).  The purpose of this requirement is two-fold.  First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id*. (quoting *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004)).  Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544.  Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record."  *Rogers*, 486 F.3d at 243.

     Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence.  *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406.  The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them.  *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984).  According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability.  This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled.  "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id*.  It is the Commissioner who must make the final decision on the ultimate issue of disability.  *Duncan*, 801 F.2d at 855;  *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

     The Court finds the ALJ failed to provide good reasons for rejecting Dr. Pham's opinion that Patterson would need to elevate his right leg for 6 hours per day.  Although the decision

discussed several of the limitations set forth in Dr. Pham's opinion,[7] it failed to acknowledge this specific provision.  This is particularly troublesome because, as set forth *supra*, the VE was specifically asked about this limitation and testified that "the bottom line is that a lot of employers would find [the elevation requirement] unsafe and they wouldn't allow for that . . ." (Tr. 85.)  Upon further questioning, the VE concluded  "there would be some jobs [with this limitation] but . . . the numbers would be very insignificant." (Tr. 86.)  Indeed, the VE could not even give an exact number of jobs that would be available with such a limitation.  *Id.*  Moreover, the Court notes there is evidence in the medical record to support Dr. Pham's opinion that Patterson would need to elevate his leg, including treatment notes from Dr. Duffy indicating Patterson was advised to elevate his leg "above the level of the heart when sitting." (Tr. 391, 470.)  In light of the above, it cannot be said that it was harmless error for not addressing Dr. Pham's opinion that Patterson would need to elevate his right leg for 6 hours each day.

The Court notes (as did the ALJ) that Dr. Pham had only treated Patterson for approximately one month when he completed his October 2012 opinion.  (Tr. 27.)  However, even if Dr. Pham were considered an examining (but not treating) or "other source," the ALJ's failure to address Dr. Pham's elevation limitation would still constitute error requiring remand. Although not required to provide "good reasons" for rejecting the opinions of such sources, an ALJ nonetheless is required to consider opinions from these sources and provide some basis for rejection.  *See* 20 CFR § 404.1527(c)("Regardless of its source, we will evaluate every medical opinion we receive."); Social Security Ruling ("SSR") 06-03p, 2006 WL 2329939 (Aug. 9, 2006).  *See also Puckett v. Colvin*, 2014 WL 1584166 at * 9 (N.D. Ohio April 21, 2014) (explaining that, although the ALJ was not required to evaluate opinions of consultative examiners with same standard of deference as would apply to an opinion of a treating source, he

---

[7] The Court rejects Patterson's argument that the ALJ "fail[ed] to acknowledge the residual functional capacity assessment completed by Dr. Pham." (Doc. No. 15 at 14.)  This is flatly incorrect.  The ALJ expressly acknowledged Dr. Pham's October 16, 2012 Physical RFC Assessment (which he identified as Exhibit 11F), and discussed several of the specific opinions contained therein.  As discussed above, however, the ALJ did not address (or even acknowledge) Dr. Pham's opinion that Patterson would need to elevate his right leg for 6 hours per day.

was required to "acknowledge that [the examiners'] opinions contradicted his RFC finding and explain why he did not include their limitations in his determination of Plaintiff's RFC" ); *Jones v. Colvin*, 2015 WL 1400680 (N.D. Ohio March 26, 2015) (stating that "opinions from "other sources" who have seen the claimant in their professional capacity 'should be evaluated using the applicable factors, including how long the source has known the individual, how consistent the opinion is with other evidence, and how well the source explains the opinion.'")(quoting *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007)).

Accordingly, whether Dr. Pham is considered to have been a treating, non-treating but examining, or "other" source at the time he rendered his opinion, the Court finds the ALJ was required to explain his basis for rejecting his conclusion that Patterson was required to elevate his leg for 6 hours per day, particularly in light of the VE's testimony regarding this restriction. Thus, it is recommended that remand is necessary to provide the ALJ an opportunity to address this issue.

As the Court is recommending a remand for further proceedings, and in the interests of judicial economy, the Court will not consider the other arguments raised in Patterson's brief. However, as this matter is being remanded to address Dr. Pham's opinion regarding the need for Patterson to elevate his right leg, the Court recommends the ALJ give further consideration on remand to the following: (1) whether Patterson's use of a cane is "medically necessary;" and, (2) the effect of Patterson's obesity both as to whether he meets a listing and with respect to the RFC assessment.

### VII.  Decision

For the foregoing reasons, the Court finds the decision of the Commissioner not supported by substantial evidence.  Accordingly, the decision should be VACATED and the case REMANDED, pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this Report and Recommendation.

s/ Greg White
United States Magistrate Judge

Date: May 12, 2015

22

**OBJECTIONS**

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**

23